Charles **ROBINSON**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 00–CV–00842C.

United States District Court,
W.D. New York.

Aug. 9, 2004.

Paul William Beltz, P.C., Buffalo, NY (Terrence P. Higgins, of Counsel), for Plaintiff.

Michael A. Battle, United States Attorney, Buffalo, NY (Mary K. Roach, Esq., and Monica J. Richards, Assistant United States Attorneys, of Counsel), for Defendant.

CURTIN, District Judge.

Plaintiff Charles Robinson brings this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671, *et seq.,* to recover money damages for injuries he claims to have sustained when he slipped and fell on a service area floor at the United States Postal Service ("USPS") Buffalo Processing and Distribution Center, located at 1200 William Street, Buffalo, New York, on December 10, 1999.

A non-jury trial was held before this court in December 2003. Plaintiff testified at trial, and offered the testimony of John B. Abram, Nancy Berry–Laporta, Charles L. Johnson, Kathleen Skeide, Richard Widmer, Gerald Tadak, Cameron Huckell, M.D., and Andrew Matteliano, M.D. Defendant offered the testimony of Niema Erving, Dawn Szczechowiak, Kenneth Murray, and Thomas Pastore, M.D. Ef-

forts to settle after trial failed, and the court considered briefing and summations. The following constitutes the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### A. *Background*

There is no dispute that plaintiff slipped and fell on the service area floor of the cafeteria at the USPS William Street facility on December 10, 1999 between 12:30 a.m. and 1:00 a.m. (Tr. 84).[1] At the time of the accident, plaintiff was an employee of the Eurest Corporation (Eurest), which provided cafeteria services at the William Street facility. However, the maintenance of the premises is the responsibility of the USPS. At the time of the accident, plaintiff had worked for Eurest at the William Street Post Office cafeteria for about two or three weeks. Before that, he had worked for Eurest at other facilities since June or July of 1998 (Tr. 322–24).

The cafeteria at the William Street facility is open 24 hours a day to postal workers only. It consists of a kitchen area used only by Eurest employees, a service area with tables where the food was laid out along the side of the room, a salad cart in the middle of the room, a cashier's station, and beyond that tables and chairs for customers of the cafeteria. There is a door between the kitchen and the service area which had a small window at eye level, measuring approximately 2½ feet high by 6 inches wide (*see* plaintiff's Ex. 8). If a person looked through the window approaching the door, he could see someone on the other side of the door, but he could not see the floor.

In the center of the service area there is a salad cart measuring approximately 10 feet long by 4 feet wide. Beyond that and away from the door at a distance of about 15 or 20 feet is the cashier's station. The hot service entree area was only a few feet from the door leading from the kitchen to the service area. The floor of the service area has a ceramic tile and concrete surface (Tr. 47, 78).

It was the practice of Richard Widmer and Gerald Tadak, who were maintenance employees of the Postal Service at the time of plaintiff's accident, to start mopping the cafeteria area at some time between 12:05 and 12:15 a.m. after the customers in the cafeteria area had thinned out. They followed their usual practice on the morning of December 10, 1999. At the time of plaintiff's fall, Mr. Widmer had already mopped the area near the door between the kitchen and the service area. When plaintiff fell, Mr. Widmer was on the other side of the salad cart where he could not see the door or plaintiff coming into the service area.

### B. *The Accident*

On the night of the accident, plaintiff began work at his usual shift about midnight. Shortly thereafter, his supervisor, Niema Erving, asked him to take a case of coffee, which was stored in the kitchen, into the service area. The coffee was in a box described as 20 inches by 13 inches by 10 inches, weighing between 24 and 30 pounds (Tr. 341–42; Ex. 15). Plaintiff obtained the box from the kitchen and entered the service area, where he slipped on the wet floor and fell.

Several USPS employees were in the service area at the time plaintiff slipped and fell: Charles Johnson, Nancy Berry–Laporta, Kathleen Skeide, Richard Widmer, and Gerald Tadak. Eurest employee Niema Erving was also present. These witnesses testified at the trial. Their tes-

---

1. References preceded by "Tr." are to pages of the trial transcript (Items 46–52).

timony with respect to their observations of the circumstances of the accident, along with that of the plaintiff, is summarized below.

### 1. *Plaintiff Charles Robinson*

Plaintiff testified that at the time Ms. Erving made a request for him to bring a case of coffee from the kitchen into the service area, she was at the cash register (Tr. 427). Plaintiff was in the kitchen "panning up bacon" (Tr. 337). He proceeded to the dry storage area in the kitchen, obtained a case of coffee, and carried it to the door. As he approached the door, he pulled the door inward while continuing to hold the box. He held the door open with his left foot and walked through it (Tr. 344–45, 433).

As he walked into the service area, he was carrying the box in both hands (Tr. 435). He took "[t]wo or three steps" into the service area, and then turned left toward the cupboard where he intended to place the coffee (Tr. 345). He testified that at that point "[his] feet just flew out from under [him], and [he] went down" (*id.*). He did not observe the condition of the floor before he fell, and did not become aware that the floor was wet until after he fell (Tr. 347, 437, 513). It is not disputed that there were no warning signs anywhere in the immediate area at the time.

Plaintiff testified that he had been in the service area earlier in his shift, and the floor was dry (Tr. 360). As he was lying on the floor after he fell, he observed the condition of the floor and later stated that "it was like someone had put five gallons of water on the floor" (Tr. 446). His whole back and side were soaked, and his head was wet (*id.*). He was wearing black slip-resistant hiking boots at the time. He had worn these boots at work on a regular basis, and no one ever told him the boots were not in compliance with Eurest requirements (Tr. 375–76). He had never had any other slipping incidents before while wearing them (Tr. 517).

### 2. *Richard Widmer*

Richard Widmer is a USPS maintenance employee who was on duty on the night of the accident. He and fellow maintenance worker Gerald Tadak were assigned to clean the cafeteria and service area at the William Street facility. The cafeteria and service area were cleaned every night after midnight and before 1:00 a.m., after customers had thinned out (Tr. 20, 42, 46–47, 79–80, 84).

Mr. Widmer testified that USPS maintenance procedures required "wet floor" signs to be placed in the area to be mopped prior to mopping. The signs are required to be left in place until the floors are dry (Tr. 69). It was common practice for custodians at the William Street facility to place the "wet floor" signs at the general entrances and exits to and from the service area of the cafeteria, but not within the service area itself (Tr. 42–44). The mopping procedure involved dispensing water and cleaning solution into the bucket (in the "slop room"), wheeling the bucket and mop to the area to be cleaned, placing the mop in the bucket, and "wring[ing] it out good" before mopping in a "circle 8" (Tr. 47–48, 69).

At the time of the accident, Mr. Widmer had already mopped the area near the door where plaintiff later fell (Tr. 54–56). Mr. Widmer testified that the condition of the floor in that area was "damp" (Tr. 55). He was mopping the floor in the middle of the service area, between the movable salad cart and the stationary beverage counter, when he heard a sound "like a body hitting the ground" (Tr. 30, 33–34; Ex. 12). He did not see plaintiff fall (Tr. 30). Mr. Widmer walked to his right, around the salad cart, and saw plaintiff lying on the floor, turned to the right and more or less

up on his right elbow (Tr. 60–61, 80). Plaintiff's clothes did not appear to be wet (Tr. 81–82). Mr. Widmer asked plaintiff if he was okay. Plaintiff "seemed to be okay, except for rubbing his arm, he hurt his elbow" (Tr. 62). Mr. Widmer "apologized for the mopping, but not that [he] did anything wrong" (Tr. 81), and went back to work.

### 3. *Charles Johnson*

Charles Johnson, a USPS employee, was in the service area on the night of the accident (Tr. 93–94). He usually started work at 11:30 p.m., and went to the cafeteria to get coffee between 12:20 and 12:40 a.m. (Tr. 103). USPS maintenance personnel were usually in the cafeteria area when Mr. Johnson got his coffee (Tr. 105, 114).

On the night of the accident, between 12:20 and 12:40 a.m., Mr. Johnson entered the service area, got a cup of coffee, and proceeded to the cashier's station (Tr. 95, 103, 115, 116). He did not notice any signs posted at the cafeteria entrance, although he had observed "wet floor" signs there on previous occasions (Tr. 95–96). As Mr. Johnson entered the service area, he noticed that the entire floor of the service area was "very wet" (Tr. 97, 100). There was more water on the floor than he had observed on other occasions (Tr. 100–01). He changed his manner of walking because he was concerned he would slip and fall on the wet floor (Tr. 99).

After he got his coffee, Mr. Johnson walked to the cash register, but there was no cashier (Tr. 95, 106). While he was waiting at the cash register, he saw Kathy Skeide and Nancy Berry–Laporta at the hot entree area (Tr. 101, 115). As he turned to speak to them, he saw the door from the kitchen open and he saw a person come into the service area carrying a box (Tr. 106–07). The person's elbows were bent, and the box was being carried at chest height (Tr. 118–19). The person was later identified to him as plaintiff (Tr. 108).

Mr. Johnson testified that he did not see plaintiff fall (Tr. 119, 120–21). He heard a "thud," and one of the women screamed, "oh my God" (Tr. 121). Mr. Johnson set his coffee on the counter and proceeded to where plaintiff had fallen, taking "baby steps" because the floor was slippery (Tr. 109–110). Plaintiff was kneeling, trying to get up. Mr. Johnson grabbed him under his arm and helped lift him up (Tr. 109). When Mr. Johnson asked plaintiff if he was okay (Tr. 109), plaintiff replied that he was and brushed himself off (Tr. 122, 127). Mr. Johnson noticed that the floor in the area where plaintiff fell was "very wet" (Tr. 110, 117).

### 4. *Kathleen J. Skeide*

Ms. Skeide is employed by the USPS as a sorting clerk. Her hours of work in December 1999 were 10:00 p.m. to 6:30 a.m. (Tr. 131–132). It was her general routine to go to the cafeteria at about 12:30 a.m. with her friend, Nancy Berry–Laporta, to get something to eat (Tr. 133, 152). She would often see custodians mopping the floor of the service area around 12:30 a.m. (Tr. 152), but never noticed any "wet floor" signs (Tr. 134).

Ms. Skeide testified that when she entered the service area with Ms. Berry–Laporta on December 10, 1999, she noticed that the floor was wet (Tr. 135). She did not see any warning signs. She walked to the "grill area" where the hot entrees were served. She changed her normal way of walking because of the wet floor (Tr. 137). She walked lighter on her feet and more slowly to avoid slipping and falling (Tr. 136, 153).

Ms. Skeide testified that while she and Ms. Berry–LaPorta were standing in the grill area, she saw plaintiff come through the door to the kitchen area holding a box

with both hands in front of his body. She could see the door peripherally because it was very close to the grill area. She identified the box entered in evidence as Exhibit 15 as similar in size to the box carried by plaintiff. She saw plaintiff slip and fall almost immediately after he entered the service area. He fell hard, landing on his back. Ms. Skeide said, "oh my God," and both she and Ms. Berry–Laporta turned around and observed plaintiff lying on his back with his head about one or two feet from the door (Tr. 140–45). Ms. Skeide marked the location of plaintiff's head and feet in green marker on Exhibit 12 (Tr. 154).

### 5. *Nancy Berry–LaPorta*

Nancy Berry–Laporta is employed by the USPS as a mail processor. In December 1999, her work hours were 7:50 p.m. to 4:20 a.m. Her usual routine was to take a lunch break with Ms. Skeide at about 12:30 a.m. At that time, she would normally see maintenance workers mopping the floor of the service area, but she never saw any "wet floor" signs, and she saw none on the night of the accident (Tr.166–68, 171–72, 182–83).

Ms. Berry–Laporta testified that on the night of the accident, she saw a custodian in the service area when she walked in (Tr. 175). She walked to the right side of the salad cart and proceeded to the grill area. She noticed right away that the floor was wet, so she tiptoed (Tr. 167). Her path of travel is marked in orange on Exhibit 12. She circled in orange the location where she and Ms. Skeide were standing when plaintiff fell (Tr. 183).

While Ms. Berry–Laporta was standing at the grill area, she heard a "loud thud" and turned to see plaintiff a couple of feet away, "on the floor on his back end" (Tr. 176–77). She did not see plaintiff come through the doorway or fall (Tr. 177, 187–88). She noted the location where plain-

tiff's feet came to rest with blue pen on Exhibit 12 (Tr. 171). She asked plaintiff how he was, and he said he thought he was all right (Tr. 188).

### 6. *Gerald Tadak*

Gerald Tadak is a retired maintenance employee of the USPS. On the evening of the accident, he was cleaning in the seating area of the cafeteria (Tr. 214–17). He did not see the accident, and he did not know the condition of the service area floor at the time plaintiff fell (Tr. 231).

Mr. Tadak testified that USPS procedures required the placing of "wet floor" signs at the three areas of public access to the service area during floor maintenance, but not on either side of the doorway leading to and from the kitchen (Tr. 218–21). He also testified as to the proper procedures for "damp mopping," which was the process he and Mr. Widmer employed on the night of the accident (Tr. 229–30). At some point prior to the day of the accident, Mr. Tadak had suggested to the cafeteria manager that the cafeteria should be closed for half an hour during floor maintenance, but the suggestion was never implemented (Tr. 232–33).

### 7. *Niema Erving*

Niema Erving testified as a witness for defendant. Ms. Erving is an employee of Eurest Corporation. On the night of the accident, she was working as night supervisor and cashier. In the course of her duties, she operated the cash register and supervised plaintiff and other Eurest employees as they prepared food on the menu. She was familiar with the USPS maintenance routine for cleaning the cafeteria, which usually occurred between 12:30 and 1:30 a.m. and included mopping the floor (Tr. 274–76).

Ms. Erving testified that at some point during the night of the accident, she asked

plaintiff to get her a case of coffee from the storage area (Tr. 278, 314–15). At trial, she did not recall where she was when she made this request (Tr. 279), but at her deposition she indicated that she was in the storage room and plaintiff was in the kitchen when she asked him to get the coffee (Tr. 317). At the time plaintiff fell, she was standing near the cashier's station, indicated by the pink box located at the center bottom of Exhibit 12 (Tr. 277, 314–15).

As plaintiff entered the service area with the box of coffee, Ms. Erving was at the cash register, facing him. Ms. Erving saw him come through the door carrying the box in front of his body, and she saw him take five to six steps before he slipped and fell. She saw him fall into a sitting position. She "heard a big thud" and "actually felt it" when he hit the ground (Tr. 305). His neck, back, and head did not hit the ground, and his feet did not flip over his head (Tr. 281–84). She was unsure whether he struck any other parts of his body (Tr. 299).

Ms. Erving testified that she immediately went over to plaintiff after he fell. The floor was wet between the cashier's station and the area where Robinson fell, and Ms. Erving changed her normal way of walking because she was concerned about falling (Tr. 282–84). She described the floor in the area where plaintiff fell as being "very wet" (Tr. 308).

USPS Maintenance Supervisor John Abram and Eurest Food Service Director Dawn Szczechowiak also testified at the trial. Their testimony is summarized below.

### 8. *John Abram*

Mr. Abram testified on behalf of plaintiff. At the time of plaintiff's accident, Mr. Abram held the position of Supervisor of Maintenance Operations. His duties included supervising custodial employees and investigation of employee incidents. He is currently retired (Tr. 240–42).

Mr. Abram learned of plaintiff's accident at approximately 2:00 a.m. on December 10, 1999, when he received a telephone call from the Manager of Distribution Operations. Mr. Abram's investigation included interviews of plaintiff, Mr. Johnson, the custodians, and the Health Unit nurse (Tr. 242–43). He also filled out various accident report forms, including an "Injury Management" form (Ex. 25; Item 54, Ex. E), and an "Accident Analysis Report" (Ex. 23; Item 54, Ex. F).

On the Injury Management form, Mr. Abram indicated that plaintiff "[f]ell on the wet floor in the service area of the cafeteria" (Tr. 247), and suffered "cervical and back strain, contusion of right elbow" (*id.*). On the Accident Analysis Report, Mr. Abram listed "Management Factors" contributing to the accident as "no warning sign posted inside door" to the service area, and "kitchen help allowed to work during cleaning" (Tr. 252). With regard to "Employee Factors" contributing to the accident, Mr. Abram listed "unfamiliar with cleaning routine," and "no sign posted at door" (*id.*).

During his interview, which took place a few days after the accident, plaintiff told Mr. Abram that he had fallen down and hurt his right side. When Mr. Abram asked him how he was doing, he said he was okay, and that he was "a little sore" (Tr. 263–65).

### 9. *Dawn Szczechowiak*

Dawn Szczechowiak is employed by Eurest Dining Service as the food service director for Eurest at HSBC. In March 2001, she was food service director for Eurest at the William Street facility when plaintiff returned to light duty work. Prior to that time, she had no contact with him (Tr. 554–55).

She testified that she is familiar with the layout of the cafeteria and service area having worked there, on and off, for 15 years. She was very familiar with the door between the service area and the kitchen. She said that in order to open that door from the kitchen side of the door, one must pull the handle down and pull the door to open it. She identified Exhibit 15 as a box of "World's Finest Coffee," which has been used by Eurest "forever" (Tr. 557). It weighs approximately 24 pounds (Tr. 556–58).

Plaintiff called Ms. Szczechowiak in March 2001 to inform her that he had been medically cleared and was ready to return to work. She advised him that he would need to bring a doctor's note explaining any limitations placed on his work activity. Based on that information, Ms. Szczechowiak restricted plaintiff to six-hour workdays and lifting no more than 25 pounds, which was 5 pounds less than what his doctor recommended (Tr. 558–61).

## C. Treatment

Plaintiff's medical records reveal that he reported to the post office health unit at 1:00 a.m. on December 10, 1999, a short time after the accident. He told the nurse that he had fallen on a wet floor, striking the back of his head, his right posterior back, and his right arm. He said that his back was stiff, that he had limited motion in his right arm, and complained of stiffness and a burning sensation in his neck (Ex. 78–S, attached as Appendix to Item 56). He was taken to Sisters Hospital for further examination, which revealed that his neck was supple, tender over the cervical spine and right lateral neck. He had a small bruise over his right elbow and normal range of motion with tenderness. His back was tender over the right scapular border, but with normal range of motion and a normal straight leg raise. He told the nurse that he had a headache, but had no blurred vision. He complained of pain in his right elbow, between the shoulder blades, and in his back (Ex. 75–S [Item 56 Appx.] pp. 2–4).

X-rays of his cervical spine taken on the morning of the accident revealed degenerative disc disease at C5–6 with disc space narrowing and vertebral spurring. There was no evidence of fracture or subluxation (id. at p. 6). Plaintiff was told that he could return to light duty work that day, and that he could resume regular work on December 11, 1999. He was also instructed to follow up with Corporate Health Services (id. at p. 5).

Plaintiff was referred to Healthworks for physical therapy. On December 20, 1999, he completed a Rehabilitation Department past medical history sheet, which included a drawing of the human body upon which he indicated that he had pain in his neck, his middle and lower back, his elbow, and his right leg from hip to the thigh (id. at p. 24). He stated, "I have pain burning down my leg, my low back hurts, I have a shooting pain between my shoulder blades and I can only lift my arms so far without pain" (id. at p. 11). He made no mention of numbness or tingling in his arms. He continued to work.

He returned to physical therapy on December 27, 1999, at which time he was referred for back therapy three times a week for three weeks (id. at p. 14). He testified that one of the doctors at Healthworks told him that he ought to see an orthopedic specialist (Tr. 361). He cancelled his appointment for therapy on January 11, 2000, and instead went to see Dr. Cameron Huckell on January 5, 2000.

Dr. Huckell is an orthopedic surgeon specializing in spinal problems. He saw plaintiff on several occasions between January 2000 and October 2001, when he referred plaintiff to Dr. Andrew C. Matteliano. Dr. Matteliano is a physiatrist specializing in physical medicine and

rehabilitation. He saw plaintiff on several occasions between October 2001 and November 2002.

Plaintiff was also examined by Drs. Thomas E. Pastore and Kenneth E. Murray, on behalf of defendant. Dr. Pastore is retired from his practice as an orthopedic surgeon. He saw plaintiff twice, once in September 2000 and again in February 2002. Dr. Murray is a clinical neurologist who saw plaintiff on one occasion in April 2002.

All of these treating and examining physicians testified at trial. Because of its bearing on the ultimate issues to be determined by the court, the testimony of these physicians is set forth in considerable detail below.

### 1. *Cameron B. Huckell, M.D.*

Dr. Huckell attended medical school at McGill University in Montreal, Canada, receiving his degree in 1985. He completed a surgical internship at Montreal General Hospital, and was accepted into the orthopedic residency program at the University of Toronto in 1986. He completed his residency in 1992. He also completed a six-month fellowship in spine surgery, received further training in his speciality in Switzerland and France, and spent one year in advanced spinal training at Johns Hopkins University in Baltimore, Maryland. In 1993, after seven years of study, he came to Buffalo. He restricts his practice to spinal issues (Tr. 743–46).

Dr. Huckell first saw plaintiff on January 5, 2000. Plaintiff reported that he had slipped on soapy water while carrying a 30–pound package of coffee at work. His feet went out from under him, and he fell flat on his back. He stated that he twisted and strained both his neck and middle and low back, and that he had been experiencing severe lower neck and mid-thoracic ache ever since (T. 748–49). He had no spinal problems before the accident, and

had never previously seen a doctor or chiropractor for his spine (Tr. 750). He reported that since the accident, he had experienced some permanent numbness in his right small ring and long fingers, as well as low backache shooting into the front and inside of his right thigh. He also reported moderate mid-thoracic pain. His main pain was in the neck and mid-back. He reported that he was having a hard time working 24 hours per week, even with light duty activities. He had no difficulty with the control of bowel or bladder function and no numbness in the genital area (Tr. 751–53).

Physical and neurological examination revealed that plaintiff was generally fit, but he had 25 percent reduced range of motion and forward bending in the lumbar spine. He had some numbness to light touch in the right ring, long, and small fingers, indicating some sensory nerve dysfunction. This usually results from compression or alteration in the function of one of the nerves coming out of the neck (Tr. 754–55).

X-rays of plaintiff's lumbar, cervical, and thoracic spine taken on January 5, 2000 showed mild lumbar degenerative disc disease from L2 to L5. There was some disc space narrowing and some early bone spurs, which Dr. Huckell termed as marginal osteophytes. There was also disc degeneration with disc space narrowing at C5–6, indicating moderate-to-severe degenerative disc disease accompanied by posterior marginal osteophytes throughout the thoracic spine (Tr. 755–57).

Dr. Huckell's impression was that these findings were normal for a man of plaintiff's age. He concluded that plaintiff had suffered a disc and ligament strain injury as a result of the December 10, 1999 accident, and ordered MRIs at all spinal levels to rule out disc herniation or annular disc tear. Based on plaintiff's report of an

intolerable level of pain when twisting, turning, or doing heavy lifting, and difficulty tolerating even light duty, Dr. Huckell took him out of work (Tr. 757).

The MRIs were taken in February 2000 at Physicians Imaging Center, which employs state-of-the-art 1.5 Tesla magnetic imaging. The MRI report, dated February 9, 2000, was provided by Dr. Lawrence Rand, a board-certified radiologist. Dr. Huckell reviewed Dr. Rand's report, and also viewed the MRI films (Tr. 758–63).

Dr. Huckell testified that the MRI of the thoracic spine (where the ribs are attached) showed disc bulge and degeneration at both T7–8 and T8–9, indicating herniation and drying out of the discs. These are abnormal findings. The MRI of the lumbar spine (lower back) showed disc herniation causing a pinching of the nerve roots at L3 and L4. According to Dr. Huckell, these findings matched plaintiff's complaints of anteromedial thigh pain. The cervical MRI showed advanced C5–6 degeneration with a disc herniation and mild pressure on both C6 nerve roots (Tr. 764–66).

Plaintiff was seen at Dr. Huckell's office on March 29, 2000 by Kelly McKee, a physician's assistant. Ms. McKee noted the results of Dr. Rand's MRI report. She also examined plaintiff. He indicated that his worst pain at that time was in the mid-thoracic region, followed in intensity by neck and lower back pain. Numbness in the fingers and pain in the right anteromedial thigh were also still present (Tr. 766–67).

Plaintiff was next seen by Dr. Huckell on April 27, 2000. He reported chronic and persistent neck, back, leg, and arm pain. He was walking in a slightly stooped-forward position. People with lumbar spinal narrowing will often walk in this manner because it opens up the tunnel a little bit and will relieve discomfort. Dr. Huckell noted limited motion with positive

MRIs showing disc problems in the neck and mid- and lower back, and some degree of stenosis (narrowing). Dr. Huckell found plaintiff to have a temporary partial disability of marked severity. He noted that plaintiff was starting physical therapy, which Dr. Huckell hoped would improve his condition (Tr. 767–69).

On July 27, 2000, plaintiff reported that therapy was making him worse. According to Dr. Huckell, this is not an uncommon complaint for people with Robinson's injuries. Upon examination, plaintiff showed reduced truncal mobility and reduced range of motion from the previous visit. He also had weakness in his right grip, which Dr. Huckell rated at plus four. He had plus five in the left grip, which is normal. Plus four is reduced from normal, but able to withstand gravity. Plaintiff reported severe pain that did not appear to be responding to conservative treatment. He had some trouble getting dressed and he could not sit or stand for a long period of time. Dr. Huckell referred him to a chiropractor to see if it might help, but told him that if it did not help he should not continue (Tr. 769–773).

In November 2000, plaintiff reported that he went to a chiropractor, but it did not help. He reported that his thoracic spine hurt him the most. Dr. Huckell discussed with plaintiff the possibility of performing thoracic surgery, but he did not strongly recommend it because it requires a very extensive incision to correct problems at that level, and the success rate is only 50 to 60 percent. Plaintiff told Dr. Huckell he wanted to get back to the way he was, and Dr. Huckell responded that he did not think surgery would get him there (Tr. 773–75).

Upon examination, plaintiff showed limited range of motion in his neck and mid- and low back, 50 percent of normal. A straight-leg-raising test was positive for

nerve root irritation on the right leg at 60 degrees, and negative on the left leg. According to Dr. Huckell, plaintiff had a moderate-to-marked permanent disability due to his cervical, lumbar, and thoracic spinal condition which was caused by the accident of December 10, 1999. He thought that plaintiff would be a good candidate for VESID [2] training (Tr. 775–77).

When plaintiff saw Dr. Huckell on March 22, 2001, he reported that he was on light duty and was tolerating it, but he still had low back pain radiating down his legs, the right side greater than the left, and he had some slight tingling in his hands. Dr. Huckell instructed him to limit his bending, stooping, crawling, reaching, and twisting. He was also instructed not to lift more than 30 pounds, and not to sit, stand, or walk greater than two hours at any one time. Dr. Huckell limited plaintiff to a six-hour work day. He prescribed Motrin and Robaxin, a muscle relaxer (Tr. 777–78).

Plaintiff next saw Dr. Huckell on May 22, 2001. He reported that on May 16, he was kneeling behind a doorway when someone opened the door quickly and knocked him over onto his shoulder and arm. Since that incident he had increased pain in the middle of his back. He was still working at light duty. Dr. Huckell ordered further MRIs to see if there was any aggravation of plaintiff's condition. He reported that the new incident may have slightly exacerbated plaintiff's preexisting condition from December 1999, and his level of disability remained moderate to marked. He recommended that plaintiff retrain to a permanent light-duty position (Tr. 779–80).

At the July 10, 2001 visit to Dr. Huckell, plaintiff told him that he was basically doing his old job and not getting much help with the heavy lifting, resulting in exacerbation of his condition. Dr. Huckell noted reduced range of motion in the neck, mid-, and low back. Reflexes were normal, with some finger numbness. His symptoms were well controlled by reduction of activity and light duty. Dr. Huckell again recommended retraining for a permanent light-duty position, and new MRIs (Tr. 781–85).

Plaintiff last saw Dr. Huckell on October 18, 2001. He reported that his mid-back bothered him most, followed by low back, and then neck. Upon physical examination, plaintiff showed equal reflexes, with difficulty moving from a seated to standing position. Straight-leg testing was positive on both the right and left. Dr. Huckell noted that plaintiff had tried to return to his previous occupation as a cook, but was unable to continue with that work because of severe-to-excruciating pain in the neck, mid-back, and low back. He also noted that plaintiff found his symptoms tolerable, and was not interested in surgical intervention. He recommended VESID training, and referred him to a physiatrist for non-surgical pain management (Tr. 785–87).

Dr. Huckell again stated that the injury of December 1999 caused plaintiff's present condition. He stated his opinion that plaintiff will eventually need surgery on his neck, where the spinal cord shows some plastic deformation and where there is evidence of nerve function problems causing weakness in his hand and numbness in his fingers. He stated that he would expect surgery to be necessary within five to fifteen years, and estimated the cost of the surgery at about $20,000 in present day dollars. He also gave the opinion that plaintiff's condition was per-

---

**2.** "VESID" is the acronym for "Vocational Education Services for Individuals with Dis- abilities" (*see* Tr. 593).

manent, and would slowly worsen over time. He further stated his opinion that plaintiff did have preexisting degenerative changes in the spine at the time of the fall. He concluded that plaintiff would require medications similar to those he was presently taking for the rest of his life (Tr. 787–92).

On cross-examination, Dr. Huckell testified that plaintiff was referred to him by his Workers' Compensation attorneys, Sawyers and Sackell. Dr. Huckell accepted plaintiff's history that he had no prior back pain before the December 1999 accident as true, and that history was critical in determining the cause of his herniated discs. Plaintiff did not tell Dr. Huckell, however, about an automobile accident he was involved in when he was a teenager, or that he had plastic surgery to his face. He did not tell the doctor that he heard a pop in his back at the time he fell, and he said he fell flat on his back (Tr. 792–97).

Dr. Huckell testified that at the first visit, plaintiff told him that he had numbness in his right small ring and long fingers since the accident but did not mention numbness in his left side. Dr. Huckell did not check the records from Sisters Hospital or check the range of motion of the cervical spine. He did not know whether plaintiff had any range of motion limitations at the time of the accident. Dr. Huckell did not perform a straight-leg-raising test, and there was no indication of any pain or sensory problem in his legs or any indication of muscle spasm. He did test biceps strength, and the results were normal (Tr. 798–800).

Dr. Huckell testified that he ordered x-rays and looked at them on the day of the first examination. He also ordered MRIs, which were taken later. The x-rays revealed that plaintiff's lumbar spine was within normal limits. There were mild degenerative changes at L2 to L5, but this finding was not unusual for someone his

age. The thoracic spine x-ray was likewise normal. Dr. Huckell testified that he probably did not review the x-ray of the cervical spine that was taken at Sisters Hospital on the night of the accident, but any degenerative changes revealed at the time of those x-rays, as well as those revealed in the x-rays taken a month later, would have been preexisting prior to the accident. He agreed that a significant minority of persons plaintiff's age would have similar findings (Tr. 801–03).

When plaintiff returned to Dr. Huckell's office on March 29, 2000, the pain was worse in his thoracic region. He also complained of low back pain radiating into his right thigh. Dr. Huckell recommended conservative treatment consisting of physical therapy. The doctor told him to try therapy, and if it didn't work, he should stop. He also recommended that he see a physiatrist, but plaintiff did not see one until November 2001 (Tr. 803–05).

Dr. Huckell testified that based on the MRIs alone, he could not tell whether the herniations that were found in plaintiff's spine were caused by the December 10, 1999 accident. He said that plaintiff's history relating that he had no symptoms of herniated discs before the accident was a very important factor in this determination, and it was possible that the herniated discs existed prior to the accident (Tr. 806).

When Dr. Huckell next saw plaintiff on April 27, 2000, he reported that he had neck, mid-, and low back pain and was neurologically intact. He also reported persistent leg and arm pain, without noting on which side. Plaintiff had started physical therapy, which was recommended to help strengthen muscles, but physical therapy cannot reverse a herniated disc. Dr. Huckell noted that plaintiff walked in a slightly stooped position, but this was the only time that he noticed this limitation for

at other times he had a normal gait (Tr. 806–08).

In July 2000, plaintiff said that he had completed two months of physical therapy, but was not getting any pain relief. He was concerned the therapy was making him worse. Dr. Huckell had received an initial evaluation, dated April 27, 2000, from physical therapist Julie Perry, connected with Western New York Orthopaedic and Spine Therapy. Ms. Perry indicated that the plan was for plaintiff to be seen twice a week. The goals were to decrease his complaints of pain, to increase his cervical range of motion, and to resume the activities of daily living with minimal pain. Ms. Perry reported that plaintiff had attended only three of eight sessions and that his poor attendance had affected his progress in physical therapy. Her opinion was that he could benefit from physical therapy if he attended consistently. Forms from Western New York Orthopaedic showed that plaintiff had six no-shows between June 20 and July 20, 2000, when he was discharged from the physical therapy program (Tr. 809–14).

On July 27, 2000, Dr. Huckell referred plaintiff to a chiropractor. When Dr. Huckell saw plaintiff again on November 2, 2000, he reported that he had tried chiropractic treatment but did not get any benefit. Dr. Huckell never spoke to plaintiff's chiropractor, and never received a chiropractic report (Tr. 815).

At the November 2000 visit, Dr. Huckell noted that plaintiff's most symptomatic problem continued to be the thoracic spine, but there was no obvious paraspinal muscle spasm at that time, and he was neurologically intact. He had noted in July that plaintiff showed some reduced grip strength, but this was the only time that this was reported. At no time did plaintiff appear to have any trouble getting up and down from the table or getting dressed or undressed (Tr. 817–19).

Dr. Huckell discussed surgery with plaintiff, but he did not recommend it as a treatment option because he thought the risks outweighed the benefits. Plaintiff did not appear to be interested in proceeding with surgery in any event. Dr. Huckell recommended on several occasions that plaintiff be retrained through VESID, but he did not know whether plaintiff followed that recommendation (Tr. 819–20).

When Dr. Huckell next saw plaintiff in March 2001 plaintiff, said that he had returned to light duty work and was tolerating it. He also said that he had low back pain radiating down his legs, greater on the right than on the left. This was a subjective complaint, but it roughly matched the corresponding nerve roots where there was evidence of pinching. He also complained of occasional tingling in his hand, but he found the symptoms tolerable. There was no indication of numbness, range of motion, or muscle spasms. Dr. Huckell told him that he could continue working with his previously noted limitations (Tr. 820–23).

On May 15, 2001, plaintiff called Dr. Huckell's office leaving a telephone note with Dr. Huckell's secretary that he had injured his back at work on the previous night, when a door slammed on him. Dr. Huckell saw plaintiff at his regularly scheduled appointment seven days later, on May 22. Plaintiff said that he was kneeling behind a doorway when someone opened the door and knocked him over on his shoulder and arm, and it jarred his back and neck. He said he had increased thoracic spine pain, which had always been his most serious complaint. Dr. Huckell did not render any treatment at that time, but noted that he would order repeat MRIs if the pain continued during the next six weeks (Tr. 823–27).

When Dr. Huckell saw plaintiff on July 10, 2001, plaintiff said that he had tried to

go back to light duty work, but when he went back to his old job he was given no help with vigorous activities. He told the doctor that his symptoms were more tolerable since he had stopped working. Dr. Huckell noted that plaintiff was neurologically intact, with some reduced range of motion, some bilateral paraspinal muscle spasms, and some finger numbness. He ordered repeat MRIs (Tr. 827–29).

The second set of MRIs taken at Seton MRI were "blurrier" than the original MRIs from Physicians Imaging. When Dr. Huckell reviewed both sets at one time in preparation for his deposition, he found no fundamental difference between them, although the radiologist's review of the Seton MRIs sounded worse than the report from the Physicians Imaging MRIs. Dr. Huckell thought that the first report underreported the results, and the second overreported. Based on his review of the films, the results were essentially the same (Tr. 829–31).

At the last visit with Dr. Huckell in October 2001, plaintiff reported that he had severe-to-excruciating pain in all parts of his back while working. Dr. Huckell again told him he was a good candidate to be retrained by VESID, but he does not know whether plaintiff ever contacted VESID (Tr. 831–32).

Dr. Huckell repeated that plaintiff had preexisting degenerative disc disease. He said that in most people, this disease slowly worsens over time, and there are some who do not have accidents who become symptomatic without any apparent cause (Tr. 833–35).

Dr. Huckell testified that thoracic pain can sometimes be caused by a neck condition. This is called "referred pain." He suggested that the risks of thoracic surgery outweighed the benefits for plaintiff because the surgery is quite involved and dangerous. It involves taking out a rib, collapsing the lungs, moving the lungs and heart over to the side, removing the disc, putting in bone, putting in screws, and the lungs end up being adjacent to where all these instruments are. Dr. Huckell reserves this type of surgery for someone who is facing paralyzation from a disc herniation, or who has such severe pain that they cannot function in any reasonably tolerable way (Tr. 836–38).

Finally, Dr. Huckell explained that it was not unusual for people with multi-level disc herniations to be unable to tolerate physical therapy due to pain. Therapy is designed to strengthen the muscles supporting the spine, and if the therapy is going to do any good at all, it is best to continue with a regular course (Tr. 840–43).

### 2. *Andrew C. Matteliano, M.D.*

Dr. Matteliano is a Board certified specialist in rehabilitation and physical medicine. He completed medical school at the State University of New York Upstate Medical Center in Syracuse, and completed postgraduate training at the University of Buffalo. Physical medicine deals with musculoskeletal injuries, amputation, fractures, burns, stroke-related injuries, spine injuries, and head injuries. The majority of his caseload is musculoskeletal and spine-related. He also does shoulder rehabilitation and some head injury cases. He works mostly in consultation with spine surgeons, performing electro-diagnostic work, EMG, and nerve conduction velocity studies (Tr. 620–24).

Dr. Matteliano first saw plaintiff on November 6, 2001, on referral from Dr. Huckell for non-surgical case management. Plaintiff related his case history, stating that he was carrying a 30–pound package when he slipped on soapy water on the floor, his feet came out from under him, and he landed on his spine. He had low back pain with a burning quality down the

right lower extremity, as well as neck and mid-back pain, with some numbness and muscle spasms. He had numbness in the fingers of his right hand and complained of a pressure-like sensation between the scapula. Doctor Matteliano did not find any spasms and plaintiff's reflexes were normal. At that time, he was not working. He said that he tried to return to light duty work, but the work was not light duty and he could not continue. He was using Motrin and muscle relaxants as well as other pain medication (Tr. 624–28; 695–99).

As of November 6, 2001, straight-leg-raising tests showed no evidence of impingement on the nerve roots of the lumbar spine. He had tenderness in the lower back area upon palpation—*i.e.,* when the doctor felt his back. Dr. Matteliano did not know what plaintiff's ability to bend was, or what his range of motion of the cervical spine was, before the accident (Tr. 704–07).

Dr. Mattelliano reviewed plaintiff's MRI films. The Physicians Imaging MRI of the cervical spine showed advanced disc degeneration at C5–6 with bilobar disc herniation and pressure against both C6 nerve roots. Bilobar herniation is sometimes referred to as "dumbbell" herniation. It is bigger on the edges where the nerve roots are and skinnier in the middle (Tr. 628–30).

The MRI of the thoracic spine shows a small central to right paracentral T7–8 disc herniation, and a bulge at the T8–9 level; that of the lumbar spine shows an L4–5 disc degenerative change, with a small left lateral foraminal disc herniation, bilateral L4–5 stenosis of the foramen, and a small left lateral extraforaminal L3–4 disc herniation (Tr. 631).

Upon examination, Dr. Matteliano found plaintiff's reflexes to be normal. He had C6 sensory loss on the right side, and tap testing showed irritation of the peripheral nerves in his right wrist. He had neck tenderness most prominent at the C5 and C6 level. Neck turning was 50 to 60 degrees, while normal is 90 degrees. Side bending was short by 20 degrees(one-half), and painful. Neck extension-*i.e.,* looking straight up at the ceiling-was short by 20 degrees (one-third). There was diffuse tenderness in the shoulder blades, particularly on the right side. Side bending and trunk turning were restricted by one-third, and painful. These findings were all consistent with the disc injuries shown on the MRIs (Tr. 634–38).

Examination of the lower back revealed a reduction of the normal lumbar lordosis, which is the inward curve in the lower back. Forward bending was 60 degrees. Normal is 90 degrees. Extension testing, or backward bending, was 15 degrees. Normal is 30 degrees. Straight leg-raising was negative bilaterally, indicating no pain or numbness (Tr. 639–42).

Dr. Matteliano's impression was that plaintiff was status post-fall, with injuries to his cervical, thoracic, and lumbosacral spine. There was also soft-tissue disruption. He repeated his findings with respect to disc herniations and stenosis. He put in a request for EMG testing, which is a study of nerve conduction velocity, but no EMG testing had been done at the time of trial. Dr. Matteliano said that Workers' Compensation refused the testing. In his opinion, plaintiff had a moderate-to-marked partial permanent disability as a direct result of his injuries. He limited plaintiff to light duty work only, with no significant lifting of more than 10 to 15 pounds on a repetitive basis (Tr. 642–48).

During his testimony, Dr. Matteliano reviewed the Physicians Imaging MRIs, pointing out the disc herniations in plaintiff's cervical, thoracic and lumbar spines, as well as related nerve encumbrances (Tr. 649–656). He testified that these findings

were consistent with a person slipping and falling on a wet floor and, depending on where they are located, even small disc herniations can be very painful (Tr. 656–58).

He saw plaintiff again on November 29, 2001. His diagnosis did not change. Most of plaintiff's complaints related to the neck and lower back, and not the thoracic region. Dr. Matteliano recommended additional physical therapy, which he said generally helps patients stay more flexible and sometimes reduces symptoms. There was no notation in the report about any radiating pain from the low back into the legs. He did not perform the leg-raising test. Throughout the time of Dr. Matteliano's supervision, the range of motion in plaintiff's cervical and lumbar spine has remained about the same (Tr. 707–10).

On January 10, 2002, plaintiff reported neck tenderness upon turning, with radiation into the shoulders. There was no indication in the report with respect to thoracic pain, numbness in the hands, or pain radiating into the legs. On February 14, 2002, plaintiff reported pain in his low back and neck. He did not mention tenderness in his mid-back. At that time, Dr. Matteliano noted numbness and tingling in the fingers, consistent with herniated cervical disc at C5–6 with nerve root irritation. He felt that plaintiff needed to continue with diagnostic testing and physical therapy, although it was difficult to predict whether someone with similar injuries would have success with either therapy or chiropractic treatment (Tr. 662–64). On April 23, 2002, he reported pain in his low back, mid-back, and neck, with numbness in both hands. There was no indication of pain radiating into his legs. Plaintiff's complaints, and Dr. Mattelliano's findings, were similar at office visits on June 4, August 9, October 1, and November 21, 2002. Dr. Matteliano agreed that plaintiff's condition had remained essentially the same since the time he started treating plaintiff in November 2001 (Tr. 710–19).

Dr. Matteliano disagreed with the findings of the government's examining physician, Dr. Pastore, who stated after examining plaintiff in February 2001 that he did not need further treatment (Tr. 662). When Dr. Matteliano saw plaintiff in April 2002, he noted continuation of numbness and tingling in both hands. He continued to restrict plaintiff to light duty at work, with moderate-to-marked partial permanent disability as a result of his injuries. He sent paperwork to the VESID program to assist plaintiff to enter the program (Tr. 664–66).

Dr. Matteliano stated that plaintiff is going to need medications on a permanent basis as the result of the injuries caused by the fall. He testified that, in his opinion as a physiatrist, plaintiff had some preexisting degenerative changes which may have been nonsymptomatic prior to the fall, but his cervical, thoracic, and lumbar spine injuries were causally related to the December 10, 1999 incident (Tr. 666–72). He believed the cervical disc herniation would worsen over time, and would eventually require surgery "at some point in the future" (Tr. 674). One level cervical surgery, with minimal aftercare, would cost approximately $20,000. According to Dr. Matteliano, the risk of thoracic surgery outweighed the benefits, and it was not clear whether plaintiff would require lumbar surgery in the future (Tr. 674–77).

On cross-examination, Dr. Matteliano testified that over the past 15 years, he has treated and testified on behalf of more than 100 patients who were represented in litigation by the law firm representing plaintiff. He testifies about 10 times per year, primarily on behalf of plaintiffs. His speciality is physical medicine and rehabilitation, and he has no training or experi-

ence as a neurologist, orthopedic surgeon, or radiologist (Tr. 678–80).

Plaintiff was 48 years old at the time Dr. Matteliano first examined him in November 2000. According to Dr. Matteliano, the majority of 48–year–old people do not have back pain. However, he agreed that people who do heavy labor are more likely to have episodes of back pain, and more likely to develop degenerative disc disease. He was unaware of plaintiff's work history before his job with Eurest (Tr. 680–84).

Plaintiff's records from Sisters Hospital dated December 10, 1999 indicated a small bruise over the right elbow and normal range of motion without tenderness. There was tenderness over the right scapular border. Straight-leg raising was normal. Dr. Matteliano did not review the x-rays taken either at Sisters Hospital or at Dr. Huckell's office. He agreed that the radiologist's report of the Sisters Hospital x-rays indicated no evidence of fracture, and showed degenerative changes at C5–6 with disc space narrowing and spurring. He was asked whether these changes developed in the few hours between the time of the accident and the time of the x-ray, and he said, "[n]o, they did not" (Tr. 688). No x-rays were taken of the thoracic or lumbar spine at that time.

He reviewed the records of plaintiff's chiropractor, Enrique Rodriguez, who reported that plaintiff tolerated the chiropractic program well and showed progressive improvement after four visits. Plaintiff told Dr. Matteliano he stopped going to the chiropractor because it did not give him any longstanding relief. He also reviewed plaintiff's physical therapy reports, which showed that plaintiff attended only two sessions and did not achieve any of his goals. (Tr. 689–94).

Dr. Matteliano testified that he never requested epidural or other spine injections for temporary pain relief because the Workers' Compensation insurance carrier would not approve such a request. It was his opinion that plaintiff's cervical symptoms were related to radiculopathy, indicating pain radiating from the spine. He found no objective evidence upon which to base an opinion as to whether plaintiff had any neuropathy relating to the accident. He did not recommend EMG with respect to the lumbar spine (Tr. 700–04).

Dr. Matteliano testified that plaintiff is not a candidate for spine surgery at the present time, since his symptoms are reasonably well-controlled. He may need cervical surgery at some time in the future, but the decision on surgery would be made by plaintiff after consultation with Dr. Huckell, the neurosurgeon. Dr. Matteliano stopped recommending physical therapy because the Workers' Compensation carrier would not approve it, but he had just recently become aware that approval from that carrier is no longer required for treatment. There was a variety of other conservative treatments that could be tried before surgery, such as epidural injections, a TENS (transcutaneous electrical nerve stimulator) unit, back brace, additional physical therapy, and cervical traction (Tr. 720–23).

Dr. Matteliano testified that in his opinion, plaintiff has low back pain radiating down into his legs on both sides. However, plaintiff did not report to Dr. Matteliano that he had pain radiating into his left leg. The MRI study of the lumbar spine showed herniation on the left side. If radicular pain from that herniation was present, one would expect to see those symptoms in the left leg. The MRI study did not indicate any evidence of impingement on the right side, and the radiologist who read it did not see any impingement on the right side. Dr. Matteliano accepted as true plaintiff's statement that he had no history of prior back problems. This was

a very significant factor in Dr. Matteliano's determination regarding causation (Tr. 723–27).

### 3. Thomas Pastore, M.D.

Dr. Thomas Pastore testified as a witness for the defendant. He is currently retired from his full-time practice as an orthopedic surgeon. He graduated from the University of Buffalo School of Medicine, and completed four years of orthopedic residency there. He began his practice in 1974, and became certified by the American Board of Orthopedic Surgery in 1975. He retired in approximately 1995, and performs partial medical examinations on a contractual basis. His examination of Mr. Robinson on behalf of defendant was arranged through First Choice Evaluations (Tr. 854–59).

Dr. Pastore saw plaintiff in September 2000, and again in February 2002. At the first visit, plaintiff gave his history, which Dr. Pastore reported without reference to any prior records. Plaintiff said that he sustained an injury to his back on December 10, 1999, when he slipped and fell on a wet floor. He told Dr. Pastore he fell backward and twisted himself in a somersault motion, and injured his neck and back. Dr. Pastore testified that this description was consistent with the findings he later made upon examination. He also explained that the patient's history comprises anywhere from 50 to 75 percent of the ultimate diagnosis (Tr. 860–62).

When he saw Dr. Pastore in September 2000, plaintiff complained of pain in his spine, radiating into both of his arms. He also had stiffness of his neck and back, pain with bending and lifting, and difficulty with sitting, standing, and driving. He had not worked since January 2000, but being off work had not made him feel better. He said that sitting, standing, lying down, coughing, and sneezing did not affect his complaints, and he had no loss of bowel or bladder function. He reported no muscle spasms, which indicated no irritation of the back muscles. He had full motion in his lower back and a normal gait. He had negative crawl sign, meaning he did not require support in order to stand erect. He had no trouble getting up or down from the examining table but had a pulling sensation in his back upon straight-leg raising, with no sciatic irritation. He did not complain of any pain in the mid-back area, but he was tender to very light pressure over the thoracic spine area and had some pain in the scapula area of the shoulder blade (Tr. 863–70).

Dr. Pastore looked at the MRI of plaintiff's lumbar spine, which showed a small left-sided disc herniation. The pain radiating down the left leg was consistent with this finding. Examination of the cervical spine showed full motion of his neck without muscle spasms, indicating no significant injury to the muscles, bones, and ligaments of the neck. He performed a cervical compression test, in which pressure is put on the head that translates to the cervical nerve roots, and that examination was negative. If positive, this would cause radiating pain down to his arms or hand. He did find the neck region tender to very light pressure, and decreased sensation to a pin-prick in his entire left arm. He found no disabilities regarding muscle strength in the neck (Tr. 870–72).

Dr. Pastore testified that the cervical MRI showed a slight bulge or herniation at C5–6. If this herniation caused pressure, it would basically effect the C5–6 dermatomal, which is the nerve route running from the spine to the thumb and biceps area. He would not expect this type of herniation to cause complaints of pain and numbness in the entire arm. He made a finding of a questionable positive voluntary release sign, which indicated no definite weakness

in the nerves of the arm muscle (Tr. 872–76).

Dr. Pastore reviewed plaintiff's cervical MRI, which showed degenerative disc disease and also an arthritic change in the neck in addition to the bulging at C5–6. He gave the opinion that the finding of decreased sensation from the tips of the fingers to the shoulders involving the dermatomal on the left side was not consistent with the finding on the MRI. This is because the bulge at C5–6 was "mild," and was not causing a significant degree of pressure on the nerve. In addition, a C5–6 disc herniation would result in a specific pattern of numbness in the thumb and weakness in the biceps. He did not find any muscle weakness. His conclusion after the September 2000 examination was that plaintiff had a mild disability and could return to light duty work, with restrictions on bending, crawling, creeping, and climbing. He recommended that plaintiff undergo chiropractic treatment because of the arthritic condition in his neck area (Tr. 877–78).

When Dr. Pastore saw plaintiff again in February 2002, he was complaining of a burning sensation in his right leg and in both hands, more so on the right side, but had no complaint about shoulder pain. He had soreness in his mid-back, but the most painful area was his lower back and neck area, where he had increased pain with coughing and sneezing. He was able to sit one and one-half hours without pain, which seemed to be an improvement from his earlier visit. He had full motion of his back, no muscle spasm, no crawl signs, and had a normal gait. He was able to stand on his toes and heels. It was determined that there was some weakness in the muscles around the hip, as well as an arthritic condition of the hip, but hip motion was normal. He had tenderness in the mid-cervical area down to the lower back, and in the C4–6 region of the neck (Tr. 878–84).

He had decreased sensation in the right foot to the ankle, but sensation as normal above the ankle. He had normal reflexes and normal strength in the lower legs, indicating that there was no major dysfunction in the nerves going to the legs. Straight-leg raising was normal. He had full motion in the cervical spine, and no muscle spasm. He did have some discomfort when he rotated his neck to the left side. This could be caused by either arthritis or disc herniation, or by a number of other conditions. There was a negative cervical compression test and a slight response to the pin-prick test, indicating questionable sensory deficit in medial nerve distribution, but carpal tunnel syndrome testing was negative (Tr. 884–86).

Dr. Pastore testified that, in his opinion, the MRI was not a significant study and could be disregarded because it showed a left-sided disc herniation in the lower back, whereas plaintiff was complaining of symptoms in his right side. He had some arthritic condition in his neck, mid-back, and lower back, but these findings were consistent with his age of 47 years at the time. It was Dr. Pastore's opinion that Mr. Robinson had preexisting mild arthritis of his neck, mid-back, and lower back which was aggravated as a result of the injury sustained in December 1999. He could not state definitely whether plaintiff did or did not suffer a herniated disc as a result of the fall, but he did state that the disc herniation he found was not significant enough to cause a disability. He felt that plaintiff's injury was of mild severity since it was sustained as the result of a simple fall to the floor. Plaintiff did not fall down a flight of stairs or get hit by a car. He had a mild disability, which is less than a 25 percent loss of function (Tr. 886–90).

It was Dr. Pastore's opinion that plaintiff will not require surgery in the future because of this injury. There are no objective findings to indicate what happened when he fell, and he does have arthritis in his neck and back. Arthritis is progressive as one ages, so there is a possibility that plaintiff may require surgery based on his arthritic condition but not based on the injury. He may require medication in the future, since people who have an arthritic condition generally require longer to recover from a fall or injury and may need treatment for an extended period, sometimes a year or two, but usually they improve. Dr. Pastore stated that the history reported by plaintiff did not correlate with his opinion (Tr. 890–92).

On cross-examination, Dr. Pastore testified that he practiced from 1974 until 1994 in general orthopedics, but had no special training in spine work. He now makes himself available to examine the patients of other doctors on behalf of other entities, usually insurance companies, through First Choice Evaluations. He testified that he had contact with the Paul William Beltz law firm in November of 1987 regarding a patient he was treating for injuries to her limbs. He stated at that time that he would examine her for her extremity problems, but he was not a neck and back specialist and would defer any exams or treatment in that area to someone who specializes in that field. According to Dr. Pastore, this was one specific case, and he treated neck and back injuries throughout his practice as a general orthopedist (Tr. 892–900).

Dr. Pastore testified that a slip and fall on a wet floor is medically recognized as a mechanism for possible injury to the spine. According to his records, plaintiff reported that he did a somersault-type of fall when the accident occurred. He said his legs went out from under him, he fell backwards, it twisted him, and he flipped over

injuring his neck and back when he landed (Tr. 900–01).

Dr. Pastore stated that the symptoms of a disc injury can change significantly from day to day, and that the results of compression or straight-leg-raising tests may be positive one day and negative the next. The same is true for limitation of motion and muscle spasms. At the time he examined plaintiff and did not find any muscle spasms, plaintiff was under medication to limit the spasms. He admitted that sometimes chiropractic treatment or physical therapy can aggravate the symptoms related to disc injuries. He also agreed that it was common for people with disc injuries to become inactive in order to avoid aggravating the symptoms, which often results in weight gain. When he first saw plaintiff in September 2000, he weighed 212 pounds. When Dr. Huckell saw him in January 2000, shortly after the accident, he weighed 187 pounds (Tr. 903–06).

Dr. Pastore testified that plaintiff's complaints about being unable to sit or stand for extended periods of time and pain radiating into his arms and legs are consistent with someone experiencing pain from a herniated disc. He stated that on occasion, the chemical discharge from a herniation will itself cause irritation, without the disc material actually touching the nerve root. However, chemical irritation is usually related to the nerves in the general area of an annular tear, whereas a disc herniation usually pinches a specific nerve and causes symptoms in a specific pattern (Tr. 907–08).

He testified that while Dr. Rand's report of the cervical MRI at Physicians Imaging made specific findings of advanced C5–6 disc degeneration with mild pressure against the C6 nerve roots, Dr. Pastore merely stated there was bulging at C5–6 with degenerative disc disease. Dr. Pastore made scratch notes indicating that

there was nerve root pressure, but this finding did not make its way into his final report. He disagreed with Dr. Rand's finding of nerve root pressure, but he did not indicate this in his report. He did not make any notation or comment in his report about Dr. Rand's findings with respect to the MRIs of plaintiff's thoracic and lumbar spine (Tr. 913–19).

He found that plaintiff had mild degenerative changes, which would be normal for his age of 47. In fact, virtually everyone undergoes degenerative changes in the spine as they age, with an onset at around age 20, yet many people live their whole life symptom-free. He agreed that a traumatic event such as a fall could trigger symptomatic changes, and that the symptomatology from a traumatic herniated disc can worsen with the passage of time (Tr. 919–20).

He testified that it was possible for a person with multiple levels of herniated discs to experience pain throughout the entire spine. He also stated that in order to have pain throughout the entire spine, the person must have a ruptured disc at every level. He reported that plaintiff's pain was not localized, and that he was tender to very light skin pressure, somewhat more so at approximately C4 through C6. This would encompass the lumbosacral junction at L5–S1, and is consistent with what Dr. Rand reported as disc herniation at C5–6 and L4. However, Dr. Pastore stated that he did not believe the small disc herniation in the lumbar region reported by Dr. Rand could cause plaintiff's back problems (Tr. 924–27).

Dr. Pastore repeated his finding that the accident aggravated plaintiff's preexisting condition, and he could not say one way or another whether the disc herniation was caused by this accident. He was not shown any records of prior complaints of back injury or pain. His opinion was that plaintiff has a mild disability causally related to this injury, and that no further treatment or specific pain medication is necessary. He did not feel that plaintiff's reported history was consistent with his observations upon examination. He agreed that bilobar herniations are more complicated than single-sided herniations, and that actual pressure on the nerve root or the spinal cord itself is a strong indication that surgery ultimately will be necessary.

### 4. *Kenneth E. Murray, M.D.*

Dr. Murray is a clinical neurologist who attended medical school at the University of Buffalo, earning his M.D. degree in 1983. He had a one-year internship, followed by a three-year fellowship in neurology at Millard Fillmore Hospital, and then had a one-year fellowship in clinical neurology in Dallas. He was certified in 1988 by the American Board of Psychiatry [sic] and Neurology. He is currently an associate clinical professor at the State University of Buffalo Medical School in the neurology department, and is affiliated with Kaleida Health Systems. About 20 percent of his clinical practice involves non-surgical care and treatment of patients with neck problems and back problems (Tr. 942–45).

Dr. Murray examined plaintiff in April 2002, reviewing the x-rays and MRI scans as well as the records of the other examining doctors and caretakers. He made notations regarding plaintiff's history, which is very important in a neurological examination in terms of identifying what is causing the problem with the patient's nervous system. Plaintiff reported that he slipped and fell on a wet floor while carrying a case of coffee through a doorway in the post office cafeteria. His feet slipped out forward underneath him and he fell backwards onto his spine. As he fell, he twist-

ed his trunk in an attempt to hold onto the case of coffee (Tr. 946–49).

In the post office health unit record, plaintiff described the event as slipping on a wet floor and falling backwards, striking the back of his head, his back, and his right arm. The report of the cervical spine x-ray taken at Sisters Hospital on the night of the accident showed that he had degenerative changes at C5–6, with disc space narrowing and spurring (*i.e.,* bony overgrowth) of the vertebrae. At the examination, plaintiff told Dr. Murray that he was in constant daily pain in his upper and mid-lower back, worse with twisting or bending. He also reported pain in his neck daily on an interim basis, which fluctuated depending on his activities and changes in the weather. He complained of pain radiating from his back down the right lower extremity to the level of the ankle, as well as numbness in the third, fourth, and fifth fingers of the right hand and intermittent numbness in the second and third fingers of the left hand (Tr. 950–52).

The first cervical MRI taken in January 2000 showed significant degenerative changes at C5–6, with posterior disc herniation bilaterally and narrowing of the neuroforamin, which are the nerve roots which come out on both sides of the spine. According to Dr. Murray, herniation at this level would not ordinarily be expected to produce numbness in the third, fourth, and fifth fingers. He also reviewed the MRIs of the thoracic spine. The Physicians Imaging study done in February 2000 showed no definite disc herniation or any abnormality of the spinal cord. The subsequent MRIs taken by Seton in September of 2001 showed a mild degenerative change between T7–8 and between T8–9, with disc bulging between T7–8, but he did not see a clear disc herniation. Dr. Murray explained that there are three levels of spinal abnormality. A bulge is the least serious, followed by protrusion, then herniation (Tr. 953–56).

Dr. Murray also reviewed the Physicians Imaging MRI of the lumbar spine, which showed a degenerative change of the disc between L4 and L5 and possibly a small left lateral disc protrusion at L5 and a far lateral disc at L3–4, also on the left. He said that these findings were not consistent with plaintiff's complaints of pain radiating into his right thigh and leg, because a left herniation would be expected to cause symptoms in the left leg. He saw no evidence of herniation or protrusion on the right side. He disagreed with the radiologist's impression of mild bilateral narrowing where the nerve roots exit between L4 and L5. Dr. Murray could not see any right side abnormality (Tr. 956–58).

Upon examination, Dr. Murray noted that plaintiff weighed 203 pounds. His neck motion was restricted on bending, and on right and left rotation. He complained of pain. The restricted range of motion could be due to pain, spasm, arthritis, or some other cause. The x-rays suggested that plaintiff had arthritis in the neck. Plaintiff reported tenderness over the trapezius muscle, more on the right than on the left. He also had tenderness of the cervical paraspinal muscles, in the cervical mid-line, and in the mid-thoracic and lower lumbar levels. There was no objective finding of spasm. Plaintiff was able to bend at the waist in an attempt to touch his toes at about 60 degrees. Ninety degrees is normal. A straight-leg-raising test indicated low back pain at 60 degrees on the right side, with right thigh pain at 45 degrees. He had no atrophy, and no difficulty getting up and down from the table. He had some give-way weakness in his right upper and lower extremities, which could be due to pain or simple lack of exercise (Tr. 958–63).

Dr. Murray found no objective weakness in any of plaintiff's muscle groups, and muscle tone and deep tendon reflexes were normal. Sensory testing revealed that plaintiff did not feel pin-pricks or touching in the entire area of the right upper and right lower extremities. According to Dr. Murray, even the objective indications of abnormalities in the cervical, thoracic, and lumbar spine could not account for these sensory findings. Plaintiff's antalgic gait appeared to show pain while walking, and he had difficulty walking heel to toe (Tr. 963–65).

It was Dr. Murray's opinion that from a purely physical standpoint based on pressure on the nerves, herniation, or muscle spasm, neither the give-way weakness nor the weakness on strength testing was caused by the accident. He stated his opinion, based on the MRIs and x-rays, that plaintiff had preexisting degenerative joint and disc disease of the cervical, thoracic, and lumbar spine. He said there was no way to tell whether there was a disc herniation at C5–6 before the accident, or whether it was caused by the accident. Dr. Murray's opinion was that plaintiff's current symptoms are caused by a combination of the effect of the injury and the underlying degenerative disease of the spine. Taking everything into account, plaintiff has a mild partial disability, with some degree of permanency. He has some restriction in terms of physical activity and should avoid very heavy types of activity, but he should be able to undertake mild to moderate activity. He could not offer an opinion as to whether the condition will get worse because of the unpredictable nature of degenerative disc disease. He felt that plaintiff could perform light-duty work. He recommended that plaintiff see a pain management specialist for a period of about one year and continue to take pain relievers, muscle relaxers, and anti-inflammatory medication (Tr. 965–70).

On cross-examination, Dr. Murray testified that he reviewed the chiropractor's records, which made reference to low-sided, low-back pain on both the right and left sides. The chiropractor also noted a slight shortening of the right leg due to postural compromise, spastic and tender muscles, and spasms in different levels of his spine, mostly the neck and lower back. Dr. Murray agreed that spasms can be present at one time and absent at another. He also agreed that people generally develop degenerative changes as they age, and that many of those people live their entire lives without developing symptoms. An accident, like slipping and falling on the floor, could cause asymptomatic degenerative changes to become symptomatic (Tr. 976–79).

Dr. Murray testified that a fall like the one plaintiff described to him could be a medically recognized mechanism for disc injuries in various parts of the spine. He also agreed it was medically recognized that there could be nerve irritation from chemical reaction inflammation without any protrusion of the herniated disc itself. In addition to the indications in the chiropractor's reports of pain in both legs, plaintiff also complained to Dr. Huckell about pain radiating down both legs (Tr. 979–84).

Dr. Murray agreed that the MRIs from Physicians Imaging are better than those from Seton. Dr. Rand, the radiologist, reported that the Physicians Imaging MRI showed bilobar disc herniation at C5–6, with pressure against the C6 nerve roots on both the right and left. According to Dr. Murray, actual nerve root pressure at C6 on both sides would make the patient a possible candidate for surgical intervention, as opposed to a "strong" or "likely" candidate (Tr. 984–86).

Dr. Murray testified that he did not make any notation in his report with re-

spect to Dr. Rand's reading of the Physicians Imaging thoracic MRI, which indicated two herniated discs. Instead, he mentioned the later Seton MRI study, which he thought showed only disc bulging between T7 and T8. He agreed that in certain situations, chiropractic treatment of disc injuries could aggravate the patient's symptoms. He also agreed that all of the other treating professionals found various ranges of restricted motion, and that these findings were consistent with traumatically herniated discs at the levels that plaintiff has (Tr. 986–89).

Based on the preponderance of the credible testimony and other evidence presented at trial, I find that plaintiff suffered traumatic injuries to his cervical, thoracic, and lumbar spine as a result of the accident at the William Street facility on December 10, 1999. I also find that plaintiff had preexisting degenerative disc disease with disc space narrowing and spurring of the vertebrae, and a preexisting arthritic condition, which may have been asymptomatic prior to the accident but became symptomatic following the accident. I find that plaintiff's resulting medical condition has caused a mild -to-moderate partial permanent disability, restricting him to light duty at work.

What follow are the court's conclusions of law with respect to these findings.

## CONCLUSIONS OF LAW

Pursuant to the Federal Tort Claims Act, the federal government has consented to be sued for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Since the accident in question occurred in New York, the issues of liability and damages

are to be determined under New York law. *DiPirro v. United States*, 43 F.Supp.2d 327, 341 (W.D.N.Y.1999).

### A. *Liability*

■ In his complaint, plaintiff alleges that the wet and slippery condition of the cafeteria service area floor which caused him to slip and fall when he emerged from the kitchen was due to the negligence of the USPS, as the landowner responsible for maintenance of the floor area. To prevail on a negligence claim in New York, plaintiff must show by a preponderance of the evidence that (1) defendant owed him a duty of care, (2) defendant breached that duty, and (3) plaintiff was injured as a result of that breach. *Tuthill v. United States*, 270 F.Supp.2d 395, 398 (S.D.N.Y. 2003); *Akins v. Glens Falls City School Dist.*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981).

■ The government argues as a threshold matter that plaintiff has failed to establish by a preponderance of the evidence that the United States, as owner of the premises, breached any duty owed to plaintiff. Under New York law, landowners and business proprietors have a duty to maintain their properties in reasonably safe condition. *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583, 657 N.Y.S.2d 377, 679 N.E.2d 616 (1997). This duty, however, is not limitless. Rather, "[i]t is an elementary tenet of New York law that '[t]he risk reasonably to be perceived defines the duty to be obeyed.'" *Id.* at 583, 657 N.Y.S.2d 377, 679 N.E.2d 616 (quoting *Palsgraf v. Long Is. R.R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99 (1928)). As explained by the New York Court of Appeals in the *Di Ponzio* case:

In analyzing questions regarding the scope of an individual actor's duty, the courts look to whether the relationship of the parties is such as to give rise to a

duty of care, whether the plaintiff was within the zone of foreseeable harm and whether the accident was within the reasonably foreseeable risks. The nature of the inquiry depends, of course, on the particular facts and circumstances in which the duty question arises. The analysis is also driven by considerations of public policy. As we stated in *Waters v. New York City Hous. Auth.*, [69 N.Y.2d 225, 229 (1987),] "[t]he common law of torts is, at its foundation, a means of apportioning risks and allocating the burden of loss."

*Di Ponzio,* 89 N.Y.2d at 583, 657 N.Y.S.2d 377, 679 N.E.2d 616 (other citations omitted). Thus, "a landowner must exercise reasonable care to maintain its premises in a safe condition in view of the circumstances, accounting for the possibility of injury to others, the seriousness of such injury, and the burden of avoiding such risk." *Michalski v. Home Depot Inc.,* 225 F.3d 113, 117 (2d Cir.2000) (citing *Basso v. Miller,* 40 N.Y.2d 233, 241, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976)).

The case of *Eisenberg v. Irving Kemp, Inc.,* 256 A.D. 698, 11 N.Y.S.2d 449 (1st Dep't 1939), is illustrative of the scope of the landowner's duty under analogous circumstances. In that case, the plaintiff injured her back when she slipped and fell on a freshly waxed floor as she exited an elevator. The court described the premises owner's duty as follows:

> [A]n owner of premises who reserves control of the halls to which it invites persons to come, ... while not an insurer for the safety of such invitees, was, nevertheless, under a duty to exercise reasonable care to keep the floor of the lobby in a reasonably safe condition for access and egress to persons lawfully on the premises and free from fault .... Reasonable care in each case depends upon the degree of danger reasonably to be apprehended....
>
> Assuming the jury believed plaintiff's story that she was invited to come to the lobby when the floor directly in front of the elevators and adjacent thereto had been made slippery, oily and greasy, that such condition was not readily discernible to one stepping from the elevator in the exercise of ordinary care, and that it also was not obvious to such a person that the lobby was presently being oiled and waxed as the worker was over in the remote end of the hallway, it was for the jury to say whether under such circumstances in the exercise of reasonable care [the owner] should have seen to it that some form of notice or warning was given to plaintiff and if none was given the jury could find [the owner] guilty of negligence.

*Eisenberg,* 256 A.D. at 702–03, 11 N.Y.S.2d at 453–54 (citations omitted).[3]

Based on the testimony and evidence presented in this case, it is clear-indeed, it is undisputed-that there were no "wet floor" signs posted in the immediate vicinity, or other warnings given to Mr. Robinson, to alert him to the fact that the floor in the service area adjacent to the door he was using had just been mopped and might be slippery. Acknowledging this, defendant argues that it cannot be charged with breach of its duty of care under the circumstances because the condition of the floor was, or should have been, readily discernible to plaintiff in the exercise of ordinary care. Defendant also contends

---

**3.** In *Basso v. Miller,* 40 N.Y.2d 233, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976), the New York Court of Appeals eliminated the traditional common law distinctions in the various levels of duty owed by a landowner based on the status of the plaintiff as trespasser, licensee, or invitee, adopting instead "a single duty of reasonable care in all the circumstances." *Id.* at 240, 386 N.Y.S.2d 564, 352 N.E.2d 868 (internal quotation omitted).

that plaintiff was not "free from fault" since, as an experienced restaurant worker, he should have known that the floor of the service area was being cleaned at that hour and might be dangerously wet.

It is well-settled New York law that there is no duty on the part of a landowner to warn against a condition that can readily be observed by those employing the reasonable use of their senses, "the situation being, in such a case, a warning in itself." *Olsen v. State,* 25 N.Y.2d 665, 667, 306 N.Y.S.2d 474, 254 N.E.2d 774 (1969). However, the preponderance of the evidence at trial in this case established that the door through which plaintiff entered the service area from the kitchen had been closed, and it had only a small window which provided a very limited view of the service area floor from the kitchen side. Plaintiff was carrying a box at waist level, which further obstructed his view. By nearly all accounts of the witnesses who were in the cafeteria at the time and who testified at trial, the floor of the service area adjacent to the kitchen door had been left "very wet," yet there were no maintenance workers or warning signs in the immediate vicinity. While it is true that the cafeteria floor maintenance generally took place in the early morning hours when the number of customers was most likely to be low, it is also true that the cafeteria remained open during that time, with no interruption of service or employee work time. Accordingly, it was certainly within a reasonable zone of foreseeable risks that a kitchen service worker might be using the door to the service area at the same time the adjacent floor was being mopped. Under these circumstances, it cannot be said that the condition of the floor could be readily observed, or was "open and obvious," to a person in plaintiff's situation employing reasonable use of their senses. *Holl v. Holl,* 270 A.D.2d 864, 864, 705 N.Y.S.2d 783, 784 (4th Dep't 2000).

In addition, while the circumstances pertaining to the obviousness of the floor's condition may be relevant to the issue of plaintiff's comparative negligence, they do not negate the defendant's duty to keep its premises reasonably safe. *See Michalski,* 225 F.3d at 118; *Morgan v. Genrich,* 239 A.D.2d 919, 920, 659 N.Y.S.2d 638, 639 (4th Dep't 1997). Under the case law discussed above, this duty encompassed an obligation to exercise reasonable care to keep the service area directly adjacent to the kitchen in a reasonably safe condition for access and egress to cafeteria staff or persons otherwise lawfully on the premises, and to provide some form of notice or warning to those persons that a level of care beyond "ordinary care" was required. *See Eisenberg,* 256 A.D. at 702–03, 11 N.Y.S.2d at 453–54. Based on a preponderance of the evidence presented at trial, I find that this duty was breached when the area was left in a "very wet" condition without "wet floor" signs, restraints, or other warnings.

I also find by a preponderance of the credible medical evidence presented at trial that the injury complained of was causally related to the occurrence. As discussed above, while the treating and consulting physicians differed to various degrees with respect to the severity of the abnormalities in Mr. Robinson's cervical, thoracic, and lumbosacral spine, as revealed by the MRIs, x-rays, and other objective findings made during examination, they all agreed that those results were consistent with the type of injuries that might occur when a person slipped and fell on a wet floor. The proof also demonstrates that plaintiff had preexisting degenerative and arthritic changes predisposing him to the type of injuries that manifested themselves after the accident. However, the law is well established that the defendant must take a plaintiff as he or she finds him, and thus may be liable

for damages for aggravation of a pre-existing illness or for precipitation of a latent condition. *DiPirro,* 43 F.Supp.2d at 342; *see also Salas v. United States,* 974 F.Supp. 202, 209 (W.D.N.Y.1997) (citing cases); *cf. Steinhauser v. Hertz Corp.,* 421 F.2d 1169, 1173 (2d Cir.1970) (while plaintiff's predisposition would not defeat recovery for condition precipitated by accident, it could have significant bearing on amount of damages recoverable).

Accordingly, I find that plaintiff has met his burden of establishing, by a preponderance of the evidence, that defendant's negligence was a proximate cause of his injuries.

■ Having found that plaintiff has established the elements of his negligence claim, the court next takes up the question of comparative negligence. Under the law of New York regarding comparative liability, a plaintiff's damages "otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages." N.Y.C.P.L.R. § 1411; *see Catherman v. United States,* 1992 WL 175258, at *14 (N.D.N.Y. July 21, 1992) (plaintiff "owed a duty to himself to recognize obvious hazards and exercise the appropriate level of caution."); *Lolik v. Big v. Supermarkets,* 210 A.D.2d 703, 704, 620 N.Y.S.2d 167, 169 (3rd Dep't 1994) (plaintiff was "bound to see what by the proper use of her senses she might have seen."), *rev'd on other grounds,* 86 N.Y.2d 744, 631 N.Y.S.2d 122, 655 N.E.2d 163 (1995).

The preponderance of the evidence in this case establishes that plaintiff had several months of experience working in cafeteria services, and had worked at the William Street facility for several weeks prior to the accident. He was aware that the service area was regularly cleaned by USPS employees, and all of the other witnesses who worked at the facility testified that they regularly saw USPS maintenance personnel cleaning the floor of the service area between midnight and 1:00 a.m. Plaintiff was also aware of the likelihood that the service area floor would often become wet as the result of mopping, customer spills, or inclement weather. Despite this knowledge, he did not observe the condition of the floor as he walked through the kitchen door into the service area. While the closed door and the box of coffee he was carrying may have obstructed his view, there is nothing to suggest that these obstructions completely prevented plaintiff from paying closer attention to the situation at hand.

Based on this evidence, I find that plaintiff knew, or reasonably should have known, that the floor on the other side of the door might be wet at the time he entered the service area from the kitchen. He therefore failed to exercise the level of care that a reasonable person employing reasonable use of his senses under the same circumstances would have exercised in noticing the wet floor, taking care in walking, and avoiding falling.

Accordingly, any damages to be recovered shall be diminished by 20 percent. This reduction is fair in light of the holdings in other cases. *See, e.g., Duffy v. United States,* 49 F.Supp.2d 658, 662 (S.D.N.Y.1999) (post office patron who tripped and fell on sidewalk maintained by USPS found one-third responsible; she should have observed height differential in sidewalk which was in plain view); *Caruso v. United States,* 2002 WL 31870571, at *4 (N.D.N.Y. Dec.23, 2002) (post office patron who slipped and fell on worn stairway found 35 percent responsible; he visited facility regularly and was familiar with condition of stairway, and condition was apparent from routine observation); *De-Veau v. United States,* 833 F.Supp. 139,

145 (N.D.N.Y.1993) (patron who slipped and fell on vinyl floor at post office entrance found 15 percent responsible; he visited facility often and should have been familiar with positioning of rugs on vinyl floor, and should have exercised extra caution due to likelihood of oil or moisture on shoes); *Strauss v. New York City Transit Authority*, 294 A.D.2d 173, 742 N.Y.S.2d 38 (1st Dept.2002) (reinstating jury verdict assessing 40 percent liability to plaintiff who slipped and fell on patch of ice at entrance to subway station; she was looking straight ahead, not at ground, and ice patch was large and visible and could have been avoided); *Stoyanovskiy v. Amerada Hess Corp.*, 286 A.D.2d 727, 729, 730 N.Y.S.2d 172, 173–74 (2nd Dep't 2001) (setting aside jury's apportionment of 5 percent liability to truck driver who delivered gas and fuel and who slipped in puddle of diesel fuel while loading truck; he knew diesel fuel is slippery, saw the puddle as he was filling the truck, and intentionally stepped into the puddle of diesel fuel); *Lolik*, 210 A.D.2d at 704, 620 N.Y.S.2d at 169 (sustaining jury's apportionment of 40 percent liability to plaintiff, who failed to observe wet spot on floor of supermarket).

## B. *Damages*

 Under New York law, if the trier of fact finds the defendant negligent, and that such negligence is the proximate cause of the plaintiff's injuries, the plaintiff is entitled to recover "a sum of money which will justly and fairly compensate the plaintiff for the loss resulting from the injuries sustained." *Kehrli v. City of Utica*, 105 A.D.2d 1085, 482 N.Y.S.2d 189 (4th Dep't 1984). Generally, a plaintiff may recover for loss of earnings, medical expenses, and mental and physical pain and suffering attributable to the defendant's negligence. *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1082 (2d Cir.1988) (citing 36 N.Y.Jur.2d Damages § 57, at 102–03). As the New York Court of Appeals has noted, "an award of damages to a person injured by the negligence of another is to compensate the victim, not to punish the wrongdoer. The goal is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred." *McDougald v. Garber*, 73 N.Y.2d 246, 253–254, 538 N.Y.S.2d 937, 536 N.E.2d 372 (1989) (citation omitted).

 Thus, in awarding damages, the trier of fact must be careful to compensate the plaintiff only for injuries attributable to the defendant's negligence, and not to compensate for conditions which exist independent of that negligence. *DiPirro*, 43 F.Supp.2d at 344. While both new injuries and aggravation of preexisting ailments attributable to the negligent conduct are compensable, the plaintiff's predisposition to harm based on a preexisting medical condition is a factor to be considered by the court in assessing the reasonableness of the damage award. *Id.; see also Steinhauser v. Hertz Corp.*, 421 F.2d at 1173 (citing cases). In addition, under New York law, a person who has been injured by reason of a defendant's negligence is under a duty to mitigate by using reasonable and proper efforts to make the damage as small as practicable, and to act in good faith to adopt reasonable methods to restore himself. *See Salas*, 974 F.Supp. at 211.

In assessing the amount of damages attributable to defendant's negligence in this case, I find it appropriate to consider Mr. Robinson's predisposition to the type of injuries he suffered as a result of the December 10, 1999 accident, based on his preexisting medical conditions as indicated by the preponderance of the evidence at trial. I also find it appropriate to consider Mr. Robinson's failure to mitigate by not continuing recommended physical therapy and chiropractic treatments. With these

considerations in mind, the court turns to its assessment of reasonable damages recoverable for plaintiff's economic loss (including past and future medical expenses), and for non-economic loss (including past and future pain and suffering).

### 1. Economic Loss

Basic economic loss includes medical expenses, lost wages, and other reasonable and necessary expenses. *See Mastrantuono v. United States*, 163 F.Supp.2d 244, 254 (S.D.N.Y.2001) (citing N.Y. Ins. Law § 5102(a)). In his post-trial submissions, plaintiff sets forth the following amounts sought as economic damages recoverable against the government in this action:

| | |
|---|---|
| Past medical expenses: | $ 6,653.11 |
| Past lost wages: | $ 14,198.47 |
| Permanency of loss of use of spine: | $ 36,900.00 |
| Total past economic loss: | $ 57,751.58 |
| Future medical expenses: 4 | $ 54,826.55 |
| Total economic loss | $112,578.13 |

The parties agree that the amount of $6,653.11 in past medical expenses is properly recoverable as damages (*see* Item 57). However, defendant contends that the amount of $14,198.47 sought as past lost wages is not recoverable because plaintiff did not offer any proof at trial of past lost wages, and has waived any such claim (*id.*). Defendant also contends that the amount of $36,900 sought for "permanency of loss of use of spine" is not recoverable as economic loss since it is the same amount as the net lump sum payment made to plaintiff pursuant to the "Settlement Agreement" which he entered with Eurest's Workers' Compensation insurance carrier, Zurich Insurance Company, representing "full and final compensation for all past present and future loss of earnings, as well as for all future medical expenses incurred as a result of the injury in December 10, 1999" ("Settlement Agreement per WCL Section 32," ¶ 2, attached to Item 57). It is not disputed that the total amount of $57,751.58 sought by plaintiff as damages for past economic loss is the same amount that is subject to a statutory lien on the proceeds of plaintiff's recovery in this action, in favor of Eurest's Workers' Compensation insurance carrier. *See* N.Y. Workers' Comp. Law § 29(1).

In *Battista v. United States*, 889 F.Supp. 716 (S.D.N.Y.1995), the plaintiffs in a FTCA case sought to recover as economic loss the amount of a lump sum payment made pursuant to a Workers' Compensation award, which was subject to a lien by the employer. The court found that this amount was not recoverable as economic loss since it overlapped with the plaintiffs' claim for non-economic loss and lost future wages. *Id.* at 726–27. In addition, the court found that the existence of a Workers' Compensation award, and the lien stemming from the award, is not admissible under New York's "collateral

---

4. The future medical expenses are broken down as follows:

| | | |
|---|---|---|
| Medication: | $ 660.00 | per year for Robaxin |
| | $ 378.12 | per year for Motrin |
| Total | $1038.12 | per year |

x 28.3 years (plaintiff's life expectancy at time of trial) = $ 29,378.80

| | | |
|---|---|---|
| Doctor visits: | $ 55.00 | per visit |
| x 3.5 visits per year= | $ 192.50 | per year |
| x 28.3 years = | | $ 5,447.75 |

| | |
|---|---|
| Surgery on cervical spine | $ 20,000.00 |

| | |
|---|---|
| Total future medical expenses | $ 54,826.55 |

Defendant concedes that, if damages are awarded by the court, these figures accurately represent the amount of future medical expenses that were proven by a preponderance of the evidence at trial.

source" rule set forth at N.Y.C.P.L.R. § 4545(c),[5] "which simply does not provide for the offensive use of liens and Workers' Compensation awards to drive up damages in a personal injury action." *Id.* at 727.

Similarly, in this case, the $36,900 sought by plaintiff as economic loss for "permanency of loss of use of spine" is the same amount as the net settlement amount paid to plaintiff as full and final compensation for all past, present, and future lost earnings, and for future medical expenses. As reflected in plaintiff's Workers' Compensation Board records (submitted by defendant as an attachment to Item 57), plaintiff received a lump sum settlement payment of $41,000, as well as payments for lost wages between January 2000 and March 2001, totaling $10,098.48, for a total Workers' Compensation award of $51,098.48. The past wage amounts, plus $4,100 for attorneys' fees, were deducted from the total, resulting in a balance of $36,900. As in *Battista*, an award by the court of this amount as damages for "permanency of loss of use of spine" would be duplicative of the amount awarded as non-economic loss and lost future wages (see discussion following in Section B(2) infra),

and is therefore not recoverable as economic loss.

■ With respect to past lost wages, I find no evidence to support defendant's contention that plaintiff has waived this claim. Instead, the record is clear that, to the extent any express waiver was made, the waiver pertained only to claims for future lost wages (*see* Tr. 588–89; 607). However, it is also clear that plaintiff has failed to offer any proof of damages suffered as a result of loss of past wages, or any basis upon which a precise calculation of such amounts might be made. As alluded to above, plaintiff's Workers' Compensation Board records showing amounts awarded as past wages were submitted by *defendant* as part of its court-ordered post-trial briefing on this issue. This proof was not offered during trial at a time when defendant would have had the opportunity to object, cross-examine, or present countervailing evidence. In this court's view, reliance on this proof at this stage of the proceedings would be inconsistent with the holding in *Battista*, discussed above, with respect to offensive use of Workers' Compensation awards under New York's collateral source rule. Accordingly, plain-

---

5. C.P.L.R. § 4545(c) provides:

In any action brought to recover damages for personal injury, injury to property or wrongful death, where the plaintiff seeks to recover for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source such as insurance (except for life insurance), social security (except those benefits provided under title XVIII of the social security act), workers' compensation or employee benefit programs (except such collateral sources entitled by law to liens against any recovery of the plaintiff). If the court finds that any such cost or expense was or will, with rea-

sonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action and minus an amount equal to the projected future cost to the plaintiff of maintaining such benefits. In order to find that any future cost or expense will, with reasonable certainty, be replaced or indemnified by the collateral source, the court must find that the plaintiff is legally entitled to the continued receipt of such collateral source, pursuant to a contract or otherwise enforceable agreement, subject only to the continued payment of a premium and such other financial obligations as may be required by such agreement.

tiff is not entitled to recover economic damages based on past lost wages.

Based on this analysis, the total amount of economic damages recoverable against defendant is $61,479.66, representing the amounts of $6,653.11 in past medical expenses paid by the Workers' Compensation carrier, and $54,826.55 in future medical expenses proven by a preponderance of the evidence at trial.

### 2. *Non-economic Loss*

In New York, the trier of fact may award a prevailing plaintiff damages for non-economic losses sustained as a result of the injury and its concomitant conscious pain and suffering, including the loss of enjoyment of life. *Kane v. United States,* 189 F.Supp.2d 40, 52 (S.D.N.Y.2002). As the New York State Court of Appeals has observed:

> [R]ecovery for noneconomic losses such as pain and suffering and loss of enjoyment of life rests on the legal fiction that money damages can compensate for a victim's injury. We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong. We have no hope of evaluating what has been lost, but a monetary award may provide a measure of solace for the condition created.

*McDougald,* 73 N.Y.2d at 254, 538 N.Y.S.2d 937, 536 N.E.2d 372 (citation and internal quotation marks omitted).

There is no precise rule for fixing the value of non-economic damages. Instead, the trier of the facts must determine the value from all of the evidence in the particular case. *DiPirro,* 43 F.Supp.2d at 345 (citing cases). Damages for future pain and suffering may be recovered only when it is reasonably certain from the evidence that such damages will necessarily result from the original injury. *Id.*

In this case, the preponderance of the evidence at trial has established, with reasonable certainty, that plaintiff has had varying degrees of pain associated with the injuries to his cervical, thoracic, and lumbar spine causally related to the December 10, 1999 incident, resulting in a mild to moderate partial permanent disability and restriction to light duty at work. He testified that his right hand and three fingers on his left hand have been numb since the time of the accident. His neck occasionally "locks up," causing sharp pain to shoot down his arm (Tr. 377–78). He has constant pain, as well as occasional muscle spasms, in his neck and back. The pain is worst in the mid-back area. The medications he takes provide some pain relief, but do nothing to control his spasms (Tr. 383–84).

While there was testimony from the medical professionals regarding objective indications of herniations, bulges, and other abnormalities in plaintiff's cervical and lumbar spine, this testimony varied greatly as to cause and severity. For example, Dr. Murray found a posterior cervical disc herniation bilaterally at C5–6, but he also noted that this herniation was not consistent with plaintiff's complaints of numbness of the third, fourth, and fifth fingers of the right hand, or decreased sensation in the entire right arm, because nerve roots impacted by a C5–6 herniation ordinarily cause numbness only in the first and second digits. In addition, plaintiff did not report complaints of numbness in the first several weeks after the accident, despite Dr. Matteliano's testimony that such complaints usually become evident in a matter of days. When considered in conjunction with the cervical x-rays taken contemporaneously with the accident showing moderate to severe degenerative changes at C5–6, this evidence strongly suggests that even if the accident caused the herniation

at C5–6, plaintiff did not experience significant pain and suffering as a result.

With respect to the thoracic spine, Dr. Huckell testified that x-rays revealed degenerative disc disease in the thoracic area, which was normal for someone of plaintiff's age. Dr. Huckell read these films, as well as the thoracic MRIs, as showing "bulges" and degeneration indicating herniation at T7–8 and T8–9, but there was no definitive finding of thoracic disc herniation. Dr. Matteliano's interpretation of the thoracic MRI indicated that there was a "small" herniation at T7–8

Dr. Huckell's interpretation of the lumbar x-rays taken in January 2000 revealed mild degenerative changes in plaintiff's lumbar spine from L2 to L5, within normal limits for someone of plaintiff's age. He interpreted the lumbar MRIs as showing herniations at L3–4 and L4–5 on both sides. Dr. Pastore saw the herniation on the left side only. Dr. Matteliano found a herniation on the left side. Dr. Murray found small disc protrusions at L3–4 and L5 on the left, but no evidence of a herniation or protrusion on the right side of the lumbar spine. Dr. Rand, the radiologist, did not see evidence of impingement on the right side as a result of the lumbar herniation.

Dr. Huckell testified that the bulge at L3–4 was consistent with plaintiff's complaints of pain radiating into the thigh. However, Drs. Pastore and Murray noted that the left-sided bulge should cause pain only on the left side. In addition, Dr. Matteliano's records reveal that from November 29, 2001 to the time of trial, plaintiff did not complain of pain radiating into either of his legs.

Based on this testimony, as well as the preponderance of the other credible medical evidence presented at trial, I find that plaintiff has failed to show that he has been negatively impacted by his injuries in a significant way. His claims of difficulty

sleeping because he is awakened by muscle spasms and shooting pain in his back were not reported to his treating or consulting physicians, and he has never asked his physicians to prescribe sleeping medication. His continuing medication regimen has provided good relief from pain and spasms, and his symptoms are otherwise well controlled by conservative treatment under Dr. Matteliano's supervision. During the course of his treatment with Dr. Matteliano, plaintiff's range of motion in the lumbar and cervical spine has remained unchanged. Dr. Matteliano has found no muscle weakness or atrophy in any part of plaintiff's body, and his reflexes have always been reported as normal.

Both treating physicians cleared plaintiff to return to light duty work. Indeed, throughout the time he has treated plaintiff, Dr. Matteliano has been of the opinion he can perform light duty work, restricted only by his ability to do heavy lifting. Dr. Pastore concurred with this opinion.

With respect to the claim for non-economic damages based on loss of enjoyment of life, plaintiff has failed to present any proof tending to show "the deprivation or impairment of the senses or of [his] ability to engage in those activities and perform those functions which were part of [his] life prior to the injury." *Rufino v. United States,* 829 F.2d 354, 359 n. 8 (2d Cir.1987) (quotation omitted). He testified that he can no longer work on cars, paint windows or climb a ladder. However, he gave no explanation as to why he believed this was the case, and neither of his treating physicians indicated that he was unable to perform these activities. In any event, he admitted that he performs household chores.

While both treating physicians were of the opinion that plaintiff will need cervical spine surgery in the next five to fifteen years, neither physician recommended sur-

gery. Dr. Murray noted that in assessing a patient's need for surgery in the future, the most important factor is the nature of the patient's symptoms. In this regard, Dr. Matteliano testified that plaintiff's ability to perform light duty work remained unchanged between November 2001 and the time of trial, and his symptoms are being reasonably well controlled. Dr. Pastore was of the opinion that any surgery on plaintiff's cervical spine that might become necessary would be due to his preexisting arthritic and degenerative condition.

Plaintiff testified that he feels depressed and frightened about the possibility of surgery. However, as mentioned, his physicians have never recommended surgery, and they do not anticipate that any surgery might be required for at least five to fifteen years. Moreover, Dr. Matteliano has not recommended epidural injections, use of a TENS unit, or other conservative treatments ordinarily employed prior to serious consideration of surgical options. Accordingly, the preponderance of the evidence suggests that plaintiff's symptomatology is currently stable, and any conclusion that he will require surgery in the future must be considered as speculative. With respect to his claim of depression, plaintiff has not sought any treatment from a psychologist or psychiatrist, and no proof was presented at trial to provide a basis for the court to award damages for psychological harm.

 As alluded to above, New York law recognizes a duty on the part of an injured plaintiff to use reasonable and proper effort to make the damage as small as practicable and to act in good faith to adopt reasonable methods to restore himself. *Yarrow v. United States,* 309 F.Supp. 922, 932 (S.D.N.Y.1970). Failure to make a reasonable effort to minimize damages "does not prevent all recovery but does prevent recovery of such damages as might have been avoided thereby."

*Id.; see also DiPirro,* 43 F.Supp.2d at 344. In addition, New York courts have long held that the plaintiff is bound to submit to treatment prescribed or recommended by his physician, unless it can be shown that a physician of ordinary skill would not adopt or sanction that treatment. *DuBois v. Decker,* 130 N.Y. 325, 331, 29 N.E. 313 (1891). The plaintiff's disinclination to receive treatment, or the fact that the treatment might cause acute physical discomfort, are not sufficient reasons to refuse the recommended treatment. *Murphy v. American Barge Line Co.,* 169 F.2d 61, 64 (3d Cir.1948), *cert. denied,* 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406 (1948).

In this case, the preponderance of the evidence shows that plaintiff failed to attend recommended physical therapy and chiropractic treatments, failed to have an electromyography ("EMG") as recommended by Dr. Matteliano, and failed to follow work restrictions imposed by his physician when he returned to work in 2001. In the absence of any showing that these recommendations would not have been made by physicians of ordinary skill, it must be presumed that adherence to the recommendations would have alleviated some measure of the pain claimed to have been suffered by plaintiff in the past, and likely to be suffered in the future. It is reasonable to assume that if plaintiff had significant pain and discomfort, he would have continued with the treatment which his physicians, therapists, and chiropractor felt would improve his condition. His failure to do so warrants a conclusion that he has failed to use reasonable and proper efforts to minimize his damages.

 Finally, a review of jury awards and settlement amounts in recent New York cases involving comparable injuries suffered under comparable circumstances, while not binding, provides helpful guidance to the court in determining a reason-

able range for the value of non-economic damages to be awarded in this case. For example, in *Lovetro v. Shuwa*, 2002 WL 975756 (New York Jury Verdicts Combined Database (N.Y.–JV) January 2002), a 31–year old male suffered herniated disc at L5–S1 with encroachment on the spinal canal and nerve root irritation when he slipped and fell on wet debris on the floor of his employer's lunchroom, landing on his back. Two separate surgical procedures for laminectomy and fusion were unsuccessful in alleviating his pain. The jury awarded him $150,000 for past pain and suffering and $1,000,000 for future pain and suffering.

In *Solomons v. Walgreen Eastern Co., Inc.*, 2001 WL 1590834 (N.Y.–JV September 2001), a 35–year–old male suffered herniated cervical discs at C5–6 and C6–7 and an impingement of the tendon of the right shoulder when he slipped and fell on a wet floor. He required anterior cervical discectomy and fusion surgery, decompression surgery on his shoulder, and a posterior fusion which utilized a bone graft from his hip. The jury awarded him $300,000 for past and future pain and suffering.

In *Corcoran v. Waverly Mews Condominium*, 2000 WL 33950913 (N.Y.–JV October 2000), a 33–year–old male postal employee suffered a herniated lumbar disc and nerve injury at L3–4 and L5–S1 which resulted in physical therapy and a need for future surgery when he slipped and fell on icy steps at the defendant's apartment complex while he was delivering mail. The jury awarded him $970,000 for past and future pain and suffering.

In *Hernandez v. Pilgrim Woods Assoc.*, 1999 WL 33489534 (N.Y.–JV December 1999), a 60–year–old male suffered a herniated lumbar disc which was treated with a micro-discectomy, and aggravation of preexisting previously asymptomatic degenerative disc disease, when he slipped and fell on ice in the parking lot of the defendant's apartment complex. The case settled after jury selection trial for a total of $95,000.

In *Jamgochian v. Wilson Farms*, 1999 WL 33489535 (December, 1999), the 40–year–old plaintiff sustained a herniated lumbar disc when he slipped and fell on the wet floor near the front door of the defendant's store. He alleged permanent radiating pain and weakness. The case settled during trial for $15,000.

In *Loconti v. State of New York*, 1998 WL 1019782 (N.Y.Ct.Cl.1998), the 64–year–old female plaintiff slipped and fell after delivering a speech at a state correctional facility. She suffered a herniated cervical disc at C6–7 with spinal nerve injury, resulting in pain and weakness in her right shoulder and hand. The award of $60,000 in total was reduced by the court to $45,000 upon a finding of 25 percent comparative negligence.

In *Smyth v. Supermarkets General Corp.*, 1998 WL 2021154 (N.Y.–JV February 1998), the 40–year–old male plaintiff slipped and fell on the floor of the produce aisle in the defendant's store, sustaining a herniated lumbar disc which required a discectomy. The plaintiff maintained that despite the surgery, he would permanently suffer some pain and weakness. The case settled prior to trial for $80,000.

In *Ledesma v. Long Island Railroad*, c 1997 WL 33346870 (E.D.N.Y. May 1997), a 46–year–old railroad worker sustained a lumbar herniation at L4–5 when he slipped on grease while descending the ladder to a railroad car, causing him to fall approximately four feet. Proof at trial established that the herniation, which was treated conservatively, will cause permanent radiating pain and restriction. The jury awarded total damages in the amount of $47,000.

In *Plaintiff v. Defendant*, 1995 WL 1934607 (N.Y.–JV September 28, 1995),

the female plaintiff, in her 30s, suffered a herniated lumbar disc when she slipped and fell on a supermarket aisle floor in an area that had just been mopped. She was pregnant at the time. She contended that she observed workers mopping the floor at the other end of the aisle, and that there was a warning sign near that area, but there was no warning sign in the area where she fell, which remained wet. Her injuries required three surgical procedures, including an attempted partial discectomy which was aborted, a laminectomy, and ultimately a spinal fusion approximately one year later. The baby was born and was healthy. The jury found plaintiff 30 percent negligent, and the case settled prior to the damages trial for a total of $240,000.

As these few examples indicate, the range of damage awards by courts and juries varies widely depending on the facts presented in the particular case. However, this court has found no case in which a 50–year–old slip-and-fall plaintiff who sustained disc herniations not requiring surgical correction was awarded an amount anywhere reasonably close to plaintiff's request of $300,000 for past pain and suffering, and $2.5 million for future pain and suffering. Indeed, of the comparable cases reviewed, the high-end award was $970,000.00, and the low-end settlement was $15,000.

Accordingly, based on all of the evidence presented at trial, including proof of plaintiff's preexisting degenerative and arthritic conditions and his failure to make reasonable efforts to minimize his damages, I find it to be reasonably certain that plaintiff has suffered non-economic damages necessarily resulting from the original injury in the amount of $50,000 for past pain and suffering, and $200,000 for future pain and suffering.

## CONCLUSION

Based on the foregoing, the Clerk of the Court is directed to enter judgment in favor of plaintiff in the amount of $249,183.73, broken down as follows:

| | |
|---|---|
| Economic Loss: | $ 61,479.66 |
| Non-economic Loss: | $250,000.00 |
| | $311,479.66 |

Reduced by 20 percent based on plaintiff's comparative negligence = $249,183.73

So ordered.